UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Kangol LLC | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) Case No.: 24-cv-1636 |
| The Partnerships and Unincorporated Associations Identified on Schedule A | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF TODD R. TUCKER

I, Todd R. Tucker, submit this Declaration on behalf of Kangol LLC in support of Kangol's Motion for Entry of Temporary Restraining Order Including (1) Temporary Restraining Order, (2) Asset Restraining Order, (3) Expedited Discovery Order, and (4) Service of Process by Email, and hereby declare as follows:

1. I am a partner attorney with the law firm of Calfee, Halter & Griswold LLP ("Calfee"), located at 1405 East Sixth Street, Cleveland, Ohio 44114. I represent Kangol LLC in the above-referenced action. I have personally reviewed all materials provided in the Exhibits attached hereto and I am personally knowledgeable of the matters set forth in this Declaration. If called upon to do so, I could and would competently testify to the following facts set forth below.

2. Upon filing of the above-captioned action, I intend to apply for appearance *pro hac vice* before the United States District Court for the Northern District of Illinois, Eastern Division.

3. Attached as **Exhibit 1** is a true and accurate copy of the publication entitled, "Alibaba, Amazon, and Counterfeiting in the Age of the Internet," 40 NW. J. Int'l L. & Bus. 157 (2020). Therein, author Daniel C.K. Chow explains, that "counterfeiters routinely use false or

1

inaccurate names and addresses when registering with these e-commerce platforms" and "[w]hen brand owners pursue counterfeiters in enforcement actions, they discovery that names and addresses are fictional, and the counterfeiters then disappear into the vast expanse of cyberspace." (at *186.) The author also explains that "[i]n those instances in which brand owns can achieve a takedown of the offending website or otherwise bring pressure to bear on counterfeiters, brand owners complain that once the counterfeit goods disappear, they reappear in short order on a new webpage." (at *187.)

4. Attached as **Exhibit 2** is a true and accurate copy of the publication entitled, "Combating Trafficking in Counterfeit and Pirated Goods, U.S. Dept. of Homeland Security's Office of Strategy, Policy, and Plans," (Jan. 24, 2020). Therein, the Department of Homeland Security (DHS) explains that "[e]-commerce platforms represent ideal storefronts for counterfeits and provide powerful platform[s] for counterfeiters and pirates to engage large numbers of potential consumers." (pg. 4.) DHS also explains, "[o]ver 85 percent of the contraband seized by CBP arrived from China and Hong Kong" and that "[a]pparel is the most commonly counterfeited product." (pp. 8 and 16.) Further, DHS explains that "[a] counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked." (pg. 11.)

5. Attached as **Exhibit 3** is a true and accurate copy of the publication entitled, "2020 Intellectual Property Rights Seizure Statistics, Fiscal Year 2021, U.S. Customs and Border Protection." Therein, U.S. Customs and Border Protection (CBP) explains that in FY 2021, "CBP

made over 27,000 seizures (i.e., 102,490 seizure lines) with an estimated manufacturer's suggested retail price (MSRP) of over $3.3 billion[.]" (pg. 5.)

6. Attached as **Exhibit 4** is a true and accurate copy of the publication entitled, "Stopping Counterfeit Trafficking on E-Commerce Platforms Through Fines and Civil Penalties (Homeland Security)." Therein, DHS explain, "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods." (pg. 1.)

7. Attached as **Exhibit 5** is a true and accurate copy of the publication entitled, "2022 Review of Notorious Markets for Counterfeiting and Piracy." Therein, the Office of the United States Trade Representative includes AliExpress, which is owned by Alibaba, on its list of Notorious Markets for Counterfeiting and Piracy. (pg. 22.)

8. Attached as **Exhibit 6** is a true and accurate copy of the publication entitled, "2023 Review of Notorious Markets for Counterfeiting and Piracy." Therein, the Office of the United States Trade Representative explains that Alibaba's policy of allowing a seller that had one storefront closed for repeated IP infringement to operate other storefront "places onerous burdens on right holders.") (pg. 34.)

9. Each Defendant has created at least one storefront on Alibaba or AliExpress using certain "storefront aliases," which are identified in the Schedule A attached to the Complaint, and through their corresponding storefront alias each Defendant offers to sell counterfeit Kangol Products.

10. Each Defendant appears to base its storefront in or otherwise source its counterfeit goods from the People's Republic of China or another foreign country.

3

11. My understanding, including based on the information set forth in attached Exhibits 1 through 6, is that foreign counterfeiters are known to evade efforts by intellectual property owners to enforce their intellectual property. For example, it has been documented that foreign counterfeiters maintain multiple storefronts on e-commerce platforms in case one storefront is targeted or shut down through enforcement efforts.

12. Based on my experience, it is also my understanding that once foreign counterfeiters learn of enforcement efforts, they often transfer their ill-gotten funds to other offshore accounts outside the jurisdiction of this Court through intermediaries like PayPal or AliPay, thwarting any effort to ascertain or recover profits attributable to their counterfeiting. *See, e.g.*, *Tory Burch LLC v. Partnerships and Unincorporated Associations Identified on Schedule A*, 2013 WL 1283824, at *9 (N.D. Ill. Mar. 27, 2013) ("The freezing of financial assets is also appropriate in this case because Defendants may otherwise transfer their financial assets to overseas accounts, thereby depriving Plaintiffs of final relief.") (*citing Reebok Int'l Ltd. V. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992)).

13. For these reasons, if the Defendants are given notice of this case before injunctive relief is in place, the Defendants may and are likely to engage in such efforts to frustrate effective enforcement of Kangol's Kangol Marks.

14. Based on my experience, it is also my understanding that email service will be reliable given that e-commerce sellers like Defendants rely on email, often exclusively, to operate their online businesses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: February 27, 2024

Respectfully submitted,

*/s/ Todd R. Tucker*
Todd R. Tucker (65617)
ttucker@calfee.com
Calfee, Halter & Griswold LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114
(216) 622-8200 (Telephone)
(216) 241-0816 (Facsimile)